IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| **Margaret O'Bannon,** | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 2:03-588-12 |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| **R.A. Green, Michael Edward Widenhouse,** | ) | |
| **All Sports, Inc., and Waccamaw Touring, Inc.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

On February 24, 2003, Margaret O'Bannon filed a complaint alleging that the defendants were negligent in causing an allision resulting in personal injuries and damages to her houseboat. The plaintiff brings this action in admiralty. Accordingly, the Court has jurisdiction over this case pursuant to 28 U.S.C. § 1333.

On August 16 and 17, 2004, this Court tried the case non-jury. After hearing the testimony, gauging the credibility of the witnesses, and reviewing the exhibits, the evidence presented, and the briefs submitted by the parties, the Court, pursuant to Rule 52 of the Federal Rules of Civil Procedure, makes the following Findings of Fact and Conclusions of Law:

**Findings of Fact**

**1.** On September 14, 2001, defendants R.A. Green ("Green") and All Sports, Inc. ("All Sports") purchased a 24 foot Suntracker pontoon boat with a 40 horse power outboard motor. Thereafter, Green filled out a South Carolina Department of Natural Resources Watercraft / Outboard Motor Application listing R.A. Green / All Sports as owner of the boat. Later the boat

was titled in the name of All Sports.

**2.** Green hired defendant Michael Edward Widenhouse[1] ("Widenhouse") to operate the pontoon boat to ferry passengers from Bucksport Marina to the QUEEN MARY II, a casino boat located in the middle of the Waccamaw River and owned by an independent third party. Widenhouse was employed by defendant Waccamaw Touring, Inc. ("Waccamaw") and paid as casual labor in cash. Waccamaw operated the gaming machines aboard the QUEEN MARY II.

**3.** On August 8, 2001, All Sports and Waccamaw were incorporated as South Carolina statutory close corporations.

**4.** Green controls all operations of his corporations All Sports and Waccamaw. Green is the sole shareholder of each. Neither corporation has a board of directors or holds corporate meetings. Neither corporation passes corporate resolutions. Green operates the corporations alone. Green admitted on the stand that All Sports, Waccamaw, and Green are "all the same company" and "all the same person."

**5.** At all pertinent times hereto, Widenhouse was the agent of All Sports and Waccamaw and was acting within the scope of said agency.

**6.** In March of 2001, the plaintiff bought the CEANNE II, a 1970 34 foot Nautaline fiberglass houseboat, for $6500.00. She fixed it up and its value before the allision at issue was approximately $12,000.00. The houseboat suffered damages in the amount of $10,000.00 from the allision. On December 7, 2001, the plaintiff sold the houseboat for $2500.00.

**7.** On September 15, 2001, the plaintiff Margaret O'Bannon and her dog were aboard the

---

[1] Defendant Michael Edward Widenhouse has not been found, was not served with the complaint, and has never appeared in this action.

2

CEANNE II, which was properly moored to the dock at Bucksport Marina, located on the Waccamaw River in Horry County, South Carolina.

8.  At approximately 9:30 pm on September 15, 2001, Widenhouse, operating alone and without the assistance of another crew member, guided the pontoon boat from the casino boat to Bucksport Marina to unload passengers.

9.  The night was clear but windy, with gusts between 15 and 25 mph, and the water current was strong.

10.  Due to the windy conditions, Widenhouse did not approach the main marina dock, but attempted to dock at the floating dock across a small waterway from the plaintiff's houseboat because it was more sheltered from the wind.

11.  After the passengers had unloaded, and while the pontoon boat was not under power, an unknown passenger standing on the dock turned loose of a line holding the pontoon boat to the dock and the starboard stern corner of the pontoon boat drifted away from the dock and swung across the waterway, making contact with the aft port side of the plaintiff's houseboat.

12.  The impact caused significant damage to the pontoon boat, including a large crease in the joint of the port pontoon.

13.  The impact caused the plaintiff to be thrown from her bed to the floor and items inside the houseboat were jostled by the impact.

14.  Several days after the allision, Officer Kim Leveridge of the South Carolina Department of Natural Resources investigated the incident at Bucksport Marina and spoke with Widenhouse and the plaintiff.  Officer Leveridge noticed some scrapes on the houseboat.

15.  The houseboat suffered structural damage in that the superstructure of the roof of the

cabin shifted to starboard, creating a gap between the side of the cabin wall and roof that let in rain. The houseboat also sustained significant damage to the port side from the impact, including scratches and a chipped thru hull fitting. In addition, there was damage to the stern starboard deck caused by the impact of the pontoon boat pushing the houseboat into the dock.

    16. The plaintiff suffered personal injuries as a result of the allision which required her to seek medical treatment from Dr. Archambeau. In falling from her bed to the floor of the houseboat, the plaintiff sustained bruises, contusions and scrapes to her body, including an abrasion on her right cheek and edema on her face. She suffered from severe headaches and pain in her back, right hip, neck, shoulders and arms after the incident. In addition, she experienced earaches and pain in the upper chest radiating up into the neck. She also had a painful range of motion in her arms and began having difficulty controlling her left arm. She had neck and muscle spasms, a burning sensation, and tenderness in the upper back and neck area. The plaintiff continued to experience these physical problems throughout 2001 and into 2002.

    17. When physical therapy and pain medication did not resolve her physical problems, she was examined by Dr. Bauerle for surgical evaluation of seven C6 radiculopathy, or nerve root compression. On August 20, 2002, Dr. Bauerle performed anterior cervical discectomy with anterior foraminotomies at C5, C6, anterior cervical interbody fusion at C5, C6, anterior cervical plating at C5, C6 with Atlantis anterior cervical plate, and preparation of fibular allograft with a port lateral c-spine exam, or cervical fusion. Dr. Bauerle removed a cervical disc, relieved the pressure on her spine, replaced the disc with a cadaverous bone and secured the area with a titanium plate and screws.

    18. The plaintiff has a six inch long visible scar on her neck from the surgery.

**19.**  After surgery, the plaintiff underwent rehabilitation, yet still experienced pain and continued taking pain medication well into 2003.  Her neck and arm pain subsided significantly, but she continued to suffer from low back pain.  At the time of trial in August 2004, the plaintiff was no longer taking pain medication.

**20.**  Because of the accident, the plaintiff could not physically perform her prior work of buying and selling fresh seafood from the date of the allision through the date of this bench trial.  She performed sedentary work for various people for low wages, including selling tickets for the Blue Crab Festival.

**21.**  The plaintiff incurred $33,488.68 in medical expenses as a result of the allision.

**22.**  The plaintiff's tax returns show that her income decreased after the allision.  In 1999, her income was $8729; $9502 in 2000; $6720 in 2001, the year of the collision; $6681 in 2002; and $8351 in 2003.

## Conclusions of Law

**A.**  The plaintiff Margaret O'Bannon brings this action in admiralty.  Accordingly, the Court has jurisdiction pursuant to 28 U.S.C. § 1333.

**B.**  To recover for her injuries, the plaintiff must prove that the defendants were negligent in the operation of the pontoon boat and that such negligence proximately caused her damages.  See Schumacher v. Cooper, 850 F. Supp. 438, 447 (D.S.C. 1994).

**C.**  The standard of proof is a preponderance of the evidence, whether direct or circumstantial.  See Valentine v. United States, 630 F. Supp. 1126, 1132 (S.D. Fla. 1986).  The sufficiency of the evidence is governed by federal law.

     **D.**  The plaintiff attempts to pierce the corporate veil and hold the individual defendant Green liable in this case.  Although piercing the corporate veil is often accomplished in a subsequent action, it is appropriate here where Green admitted on the stand that he alone controls All Sports and Waccamaw.  It would be unjust and fundamentally unfair to allow Green to hide behind his corporations when there is a complete disregard of corporate formalities and the corporations operated solely for the benefit of Green.  See <u>DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.</u>, 540 F.2d 681 (4th Cir. 1976).  Each corporation is the alter ego of Green, and therefore Green is liable for the negligence of each.  See <u>id.</u>

     **E.**  Because All Sports is the alter ego of Green, Green was an owner of the pontoon boat along with All Sports even though it was titled only in the name of All Sports.  As owners, Green and All Sports are liable for any damage caused by the negligence of the crew except in the case of a compulsory pilot.  See <u>Homer Ramsdell Trans. Co. v. La Compagnie Generale Transatlantique</u>, 182 U.S. 406, 416-17 (1901).  Widenhouse was not a compulsory pilot, therefore the owners of the pontoon boat, Green and All Sports, are liable if Widenhouse was negligent in the operation of the pontoon boat.

     **F.**  A moving vessel is presumed to be at fault when it allides with a fixed object.  See <u>The Oregon</u>, 158 U.S. 186, 197 (1895).  After such presumption arises, "[t]he moving vessel must show that it was without fault or that the collision was occasioned by fault of the stationary object or was the result of inevitable accident."  <u>Bunge Corp. v. M/V Furness Bridge</u>, 558 F.2d 790, 795 (5th Cir. 1977) (internal quotations omitted).  "The burden is heavily upon the vessel asserting the inevitable accident defense."  <u>Id.</u>  "Such vessels must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care

required." Id. (internal quotations omitted). "The test is, could the collision have been prevented by the exercise of ordinary care, caution and maritime skill?" The Jumna, 149 F. 171, 173 (2d Cir. 1906).

    **G.** The pontoon boat is considered a moving vessel because it was "underway" in that it was "not at anchor, or made fast to the shore, or aground." See Rule 3(h) of Inland Navigational Rules, 33 U.S.C. § 2003(h); see also Yarmouth Sea Products v. Scully, 131 F.3d 389, 393 (4th Cir. 1997).

    **H.** The drifting pontoon boat is presumptively liable for alliding with the stationary houseboat. The defendants have not shown that the pontoon boat was without fault, nor that the houseboat was at fault, nor that the collision was the result of inevitable accident. The pontoon boat, therefore, is at fault for alliding with the houseboat. Green and All Sports, as owners of the pontoon boat, are likewise at fault.

    **I.** In addition, Widenhouse is presumed to have caused the allision if the Court finds that he breached a duty imposed by an Inland Navigational Rule. See The Pennsylvania, 86 U.S. 125 (1874). In such case, the defendants must show that the violation did not cause the allision and could not have contributed to the allision. Id.

    **J.** Widenhouse breached Inland Navigational Rule 7 which imposes a duty upon operators of vessels to take proper steps to avoid collisions at all times. See Rule 7 Inland Navigational Rules, 33 U.S.C. § 2007. Rule 7 attempts to avoid the risk of "collision." See Ocean S.S. Co. of Savannah v. United States, 38 F.2d 782 (2d Cir. 1930). Widenhouse failed to secure the pontoon boat to the dock and did not take the necessary steps to prevent the pontoon boat from drifting across the small waterway in strong current and windy conditions. The

defendants have not shown that the violation did not cause and could not have contributed to the allision.  Widenhouse, therefore, was negligent in causing the pontoon boat to allide with the houseboat.

    **K.**  Burden shifting also results from a finding of a violation of prudent seamanship practices, in which case the defendants must prove by clear and convincing evidence that they did not contribute to the allision.  See Anthony v. International Paper Co., 289 F.2d 574, 581 (4th Cir. 1961).

    **L.**  All Sports violated prudent seamanship practices by not providing a second crew member to assist Widenhouse in the operation of the pontoon boat, including docking safely.  The defendants have not proved by clear and convincing evidence that operating the pontoon boat undermanned did not contribute to the allision.  All Sports, therefore, was negligent in operating the boat undermanned.

    **M.**  "Generally, proximate cause in the admiralty context is defined as that cause which in a direct, unbroken sequence produces the injury complained of and without which such injury would not have happened."  Ente Nazionale Per L'Energia Electtrica v. Baliwag Navigation, Inc., 774 F.2d 648, 655 (4th Cir. 1986).  All Sports was negligent in allowing the pontoon boat to strike the plaintiff's stationary houseboat; All Sports was negligent in failing to provide a fully manned vessel; and Widenhouse was negligent in his operation of the pontoon boat.  The acts of Widenhouse are attributable to All Sports and Waccamaw.  Such acts of negligence are attributable to Green and proximately caused the allision and the plaintiff's damages.

    **N.**  "The doctrine of superseding cause is ... applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about

8

by a later cause of independent origin that was not foreseeable." Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 837 (1996) (citations omitted). "It is properly applied in admiralty cases." Id. The Court finds that there was not a superseding cause of the plaintiff's injuries. A passenger dropping the line which secured the pontoon boat to the dock was foreseeable and measures should have been taken to prevent the pontoon boat from drifting across the waterway and striking the houseboat.

    **O.** In admiralty, assumption of the risk is subsumed within the doctrine of comparative fault. See Nat'l Marine Service, Inc. v. Petroleum Service Corp., 736 F.2d 272, 277 (5th Cir. 1984). The plaintiff was not at fault by mooring her houseboat along a floating dock at Bucksport Marina. The houseboat was properly moored at the dock alongside other boats, and had been for several weeks without incident.

    **P.** As a proximate result of the defendants' negligence, the plaintiff has suffered personal damages in the following amounts: $6754.00 for loss of earnings, $30,000.00 for pain and suffering, $33,488.68 for medical expenses, $30,000.00 for scarring, and $20,000.00 for loss of her ability to perform those everyday functions in life that she could have performed but for the accident. The Court is not convinced the plaintiff will suffer any future damages as a result of the defendants' negligence.

    **Q.** The defendants' negligence caused the plaintiff to suffer property damages in the amount of $10,000.00.

    **R.** Because the defendants are jointly and severally liable for the plaintiff's injuries, they are each responsible for the total amount of damages. See McDermott, Inc. v. AmClyde and River Don Castings, Ltd., 511 U.S. 202, 221 (1994).

**S.**  Waccamaw employed Widenhouse to operate the pontoon boat.  Under principles of respondeat superior, Waccamaw is liable for any negligence of Widenhouse committed within the scope of his employment.  See <u>United States v. Eleazer</u>, 177 F.2d 914 (4th Cir. 1949).  Because Waccamaw is the alter ego of Green, Green is liable for Widenhouse's negligence.

**T.**  All damages sustained by the plaintiff were proximately caused by the actions or omissions of All Sports, Waccamaw, and Widenhouse.  Under the alter ego doctrine, this Court finds and concludes that Green is also liable for all of the plaintiff's damages.

## Conclusion

Accordingly, the Court finds and concludes that Green, All Sports, and Waccamaw are liable and responsible for the damages suffered by the plaintiff.  The Court therefore awards the plaintiff $130,242.68 in total damages.

**AND IT IS SO ORDERED.**

_____
**C. WESTON HOUCK**
**UNITED STATES DISTRICT JUDGE**

July 21, 2005
Charleston, South Carolina